UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Vito Carmalitano Jr.

*Plaintiff,*

v.                                                    Civil Action No.

**KRISTA HARRINGTON**, in her official

capacity;

**KAREN SIMMONS**, in her official capacity;          **VERIFIED COMPLAINT FOR**

**CHRISTY MCLEAN**, in her official                   **DECLARATORY AND INJUNCTIVE**

capacity;                                             **RELIEF**

*Defendants.*

## I.    NATURE OF ACTION

1.    This action arises from Defendants' actions, taken under color of state law, in applying grading consequences and clinical participation restrictions within a required academic program in a manner that incorporated third-party determinations and followed Plaintiff's communications seeking clarification of program requirements, resulting in adverse academic consequences affecting Plaintiff's course standing and progression.

## II.   JURISDICTION AND VENUE

2.    This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, and presents a federal question within the meaning of 28 U.S.C. § 1331.

1

3.  Defendants acted under color of state law in their official capacities as administrators and instructors of a public educational institution.

4.  Plaintiff does not assert independent claims for relief under state law in this action, but relies on institutional policies and course materials as evidence of the standards governing evaluation and grading relevant to his federal claims.

5.  Plaintiff does not seek to enforce state law as an independent basis for relief in this action. References to institutional policies, course materials, and syllabus provisions are included as evidence of the academic standards and expectations governing Plaintiff's evaluation and grading, and as support for Plaintiff's federal constitutional claims.

6.  Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants reside in this district and the events and omissions giving rise to the claims occurred within this district.

## III.  PARTIES

7.  Plaintiff Vito Carmalitano Jr. is a student enrolled at Trident Technical College and, at all times relevant, was enrolled in the Respiratory Care Program, including RES 150, a clinical learning and evaluation course required for progression in the program.

8.  Defendant Krista Harrington is the Dean of Health Sciences at Trident Technical College and is named in her official capacity.

9.  Defendant Karen Simmons is the Program Director for the Respiratory Care Program at Trident Technical College and is named in her official capacity.

10. Defendant Christy McLean is the Clinical Coordinator for RES 150 and an instructor in the Respiratory Care Program at Trident Technical College and is named in her official capacity.

11. In their official capacities, Defendants Harrington, Simmons, and McLean each possessed authority over clinical placement decisions, grading determinations, and program progression decisions affecting Plaintiff.

12. Each participated in or directed actions resulting in Plaintiff's clinical placement restrictions, classification of absences, and imposition of grading consequences, and each is capable of providing the prospective declaratory and injunctive relief requested herein.

## A. Parties and Relevant Personnel

13. Plaintiff's participation in RES 150 required placement at third-party clinical sites, where his performance was evaluated through daily clinical assessments, documentation requirements, and competency evaluations.

14. David Harris serves as Assistant Vice President of Instruction at Trident Technical College and communicated with Plaintiff regarding grading, documentation requirements, and the availability of guidance concerning clinical expectations.

15. Defendant Harrington communicated with Plaintiff regarding clinical site determinations that he not return, conveyed clinical site feedback to Plaintiff, and communicated with Plaintiff regarding his program status and ability to continue progression in the Respiratory Care Program.

3

16. Defendant Simmons communicated with Plaintiff regarding clinical expectations, evaluation standards, grading consequences, and his standing in RES 150, including communications regarding the impact of missed clinical days and point deductions.

17. Defendant McLean communicated with Plaintiff regarding clinical scheduling, documentation requirements, and issues arising during clinical rotations, including communications concerning Plaintiff's reports regarding clinical site conditions and policy-related concerns.

18. Clinical preceptors were non-faculty personnel assigned at clinical sites who supervised students during clinical learning, directed day-to-day clinical activities, and completed or contributed to evaluations and competency documentation used in assessing student performance.

## IV.  FACTUAL ALLEGATIONS

### A. Institutional Policies Governing Evaluation and Grading

19. Institutional policy further provides that instructors will develop, distribute, explain, and follow the standards used in evaluating student performance and determining grades.

20. Institutional policy provides that grades are awarded for student academic performance, and that instructors will develop, distribute, explain, and follow the standards used in evaluating student work and determining grades.

21. RES 150, Clinical Applications I, is a required clinical learning course within the Respiratory Care Program in which students participate in off-site clinical training at various medical facilities.

4

22. Students in RES 150 are evaluated on clinical performance, documentation, and competency-based assessments, and the syllabus provides that a student must achieve a grade of C or better in the course in order to progress in the program.

23. The syllabus identifies multiple components used to evaluate student performance in RES 150, including Proficiency Evaluations, Clinical Behavior Rating, Case Studies, and a Final Examination.

24. The syllabus identifies multiple components used to evaluate student performance and establishes grading consequences associated with those components.

25. The syllabus provides specific grading consequences tied to clinical performance, including assignment of a grade of zero for failure to complete required clinical documentation and classification of such days as unexcused absences.

26. The syllabus provides fixed grading consequences associated with incomplete clinical documentation, but the syllabus itself does not explain in detail how a student is to determine, before leaving the site, whether all required documentation has been completed.

27. The syllabus requires that clinical documentation be completed "by the end of the clinical day," but does not define what constitutes the "end of the clinical day" or how compliance with that requirement is assessed.

28. The governing materials require that daily clinical documentation be completed by a preceptor and verified prior to leaving the clinical site, but do not provide instructions for how completion and verification are confirmed where completion depends on actions of third-party clinical personnel.

29. The syllabus states the grading consequences for incomplete clinical documentation, but the syllabus does not identify a specific written procedure for later correction or validation of missing preceptor-controlled documentation.

30. The syllabus provides rating domains and narrative descriptors but does not include objective behavioral scoring anchors, numerical thresholds, or defined criteria specifying when a rating shifts from acceptable to needs improvement or unacceptable.

31. The syllabus further provides that program faculty may rely on written or oral feedback from clinical personnel, including individuals who did not validate the student's daily documentation, but does not define how such information is evaluated or reconciled with documented evaluations.

32. The syllabus and related materials identify documentation requirements and grading consequences but do not describe how those requirements are evaluated, how compliance is measured, or how grading penalties are applied to specific conduct.

33. The written materials do not describe how clinical site determinations are incorporated into course grading, how such determinations are translated into attendance classifications, or how those classifications result in point deductions.

**B. Clinical Evaluation Communications**

34. Plaintiff sought clarification regarding evaluation criteria used to assess clinical performance.

35. Plaintiff requested identification of observable, behavior-based standards required for satisfactory evaluation.

36. Plaintiff's communications included requests to review applicable policies and to understand the standards governing clinical performance.

6

37. Plaintiff's communications included requests to review clinical site policies, requests for supervision while performing procedures, and reliance on syllabus requirements governing clinical conduct.

38. Plaintiff's communications were directed to program officials and sought clarification regarding how to comply with program requirements.

39. In an email dated January 26, 2026, Plaintiff requested clarification regarding the specific behaviors underlying reduced clinical evaluation ratings.

40. In a response dated January 23, 2026, Defendant McLean acknowledged Plaintiff's inquiry regarding clinical requirements and indicated that she would clarify the expected process for the semester.

41. In an email dated January 24, 2026, Plaintiff wrote to Karen Simmons requesting identification of specific expectations or behaviors considered inappropriate and clarification of the conduct underlying his clinical evaluation ratings.

42. In an email dated January 26, 2026, Plaintiff wrote to Karen Simmons, requesting identification of the specific behaviors he exhibited that led to evaluative impressions so that he could correct them moving forward.

43. Plaintiff's written communications described in paragraphs 34–42 were directed to Defendants Karen Simmons and Christy McLean and requested identification of objective criteria, behavioral expectations, and clarification of evaluation standards governing Plaintiff's clinical performance.

44. The communications described in paragraphs 34–42 occurred between January 22 and January 26, 2026, and were made prior to the adverse actions affecting Plaintiff's clinical participation and grading described in paragraph 1.

45. Plaintiff was subjected to adverse academic actions within the Respiratory Care Program, including restrictions affecting his clinical participation and the application of grading consequences, including those later described in paragraphs 110–158, as referenced in paragraph 1.

46. Defendants Karen Simmons and Christy McLean had knowledge of Plaintiff's requests for clarification of evaluation criteria, policy compliance, and supervision in the clinical setting through the communications described in paragraphs 34–42.

47. The adverse actions affecting Plaintiff's clinical participation and grading described in paragraph 1 occurred after Plaintiff's communications described in paragraphs 34–42, including multiple written requests for clarification of evaluation standards, policy compliance, and supervision in the clinical setting, and included the actions later described in paragraphs 110–158.

48. In an email dated February 3, 2026, Plaintiff wrote to Karen Simmons and Christy McLean requesting objective criteria governing clinical evaluation and grading, including clarification of how performance was assessed.

49. In an email dated February 3, 2026, Plaintiff wrote to Karen Simmons and Christy McLean stating that "the reduced rating does not seem to align with the feedback" and requested "clear, transparent, and objective grading criteria that explain how grades will be determined."

50. In the communications produced, the communications do not include a written response identifying specific, objective, behavior-based criteria underlying the evaluation ratings.

51. In an email dated February 11, 2026, Plaintiff wrote to David Harris requesting identification of any objective criteria associated with the domains on which students were evaluated.

52. In an email dated February 11, 2026, David Harris provided a response that included aspects of how grades are calculated.

53. In an email dated February 11, 2026, Plaintiff requested identification of "objective criteria, if any, associated with the domains on which we receive ratings."

54. In that same communication, Plaintiff asked: "Which specific Trajecsys documentation items… cause a zero for the day when not completed by the end of the day?" and "How are these… reconciled in order to determine how my grade is calculated?"

55. Plaintiff did not receive a written response identifying objective, behavior-based criteria associated with evaluation domains or explaining how those criteria were applied to assign ratings.

56. In an email dated February 12, 2026, Plaintiff wrote to Christy McLean, requesting that she or the preceptor describe the specific behaviors or actions that did not meet the expected standard so that he could develop appropriate corrective goals.

57. In an email dated February 13, 2026, Plaintiff stated that feedback such as "did not appear interested" did not include "specific, objective, observable behaviors that could be measured or acted upon."

58. In that same communication, Plaintiff stated that "any SMART goals that are submitted will be unable to reflect specific deficiencies" because no specific behaviors had been identified.

59. In an email dated February 25, 2026, Plaintiff requested identification of specific, objective behaviors that resulted in a reduced rating and stated that without such behavioral examples it was difficult to determine what changes may need to be made.

60. Plaintiff made multiple written requests between January and February 2026 for clarification of evaluation criteria, grading methodology, and specific behaviors associated with evaluations, as described in paragraphs 34–59.

61. The written responses described in paragraphs 40–42 and 48–55 did not explain how evaluation-domain ratings, documentation requirements, and grading deductions were combined and applied to determine Plaintiff's overall course standing.

62. The communications cited in paragraphs 34–59 do not identify behavior-based criteria identifying what specific conduct would satisfy the evaluation standards applied to Plaintiff.

63. The communications described in paragraphs 48–54 and 51–55 do not include a complete written explanation of how all grading components and point deductions were combined to determine overall course standing or how evaluation domains were translated into numerical grades.

64. On February 7, 2026, Plaintiff submitted a formal academic complaint to program officials concerning the RES 150 syllabus and the ability to determine how evaluation and grading standards were applied in the course.

65. In that submission, Plaintiff requested clarification of how grades were calculated, identification of the criteria associated with evaluation ratings, and clarification of the requirements governing clinical documentation, attendance classification, and application of grading consequences.

10

66. Plaintiff also requested issuance of a complete syllabus or other written materials identifying the academic standards governing evaluation of clinical performance, including the criteria used to assess behavior ratings and the manner in which clinical site determinations are incorporated into course grading.

67. Program officials provided responses to Plaintiff's academic complaint; however, the responses did not include a comprehensive written explanation of the evaluation criteria, did not identify objective, behavior-based standards governing grading, and did not describe how those standards were applied to Plaintiff's performance.

68. Following Plaintiff's February 7, 2026 academic complaint, the syllabus and governing course materials were not revised or reissued to include identification of evaluation standards, grading methodology, or criteria governing clinical performance assessment.

## C. Clinical Documentation Process

69. On January 15, 2026, Plaintiff completed a clinical day for which the required daily evaluation is not present in the clinical documentation system and was later identified as missing and unable to be recreated.

70. RES 150 requires preceptors to complete daily evaluations for the student.

71. The professional behavior rating is to be completed by the clinical instructor at the end of each clinic day.

72. Course materials required Plaintiff to verify completion of preceptor evaluations prior to leaving the clinical site.

73. At the time of Plaintiff's first clinical day, the course materials required student verification of preceptor evaluations but did not identify, in the written materials then

11

provided, a procedure by which a student could confirm completion of a preceptor-controlled evaluation.

74. Plaintiff's first clinical day occurred before the record reflects written clarification regarding the process for the semester.

75. At the time of Plaintiff's first clinical day, the cited written materials did not identify a written process by which a student could independently correct or cure missing preceptor-controlled documentation.

76. Course materials did not identify in writing how a student could confirm submission or obtain a missing preceptor-controlled evaluation.

77. Plaintiff requested guidance regarding how to obtain completion of a missing evaluation, including in his February 3, 2026 email, and the communications described in paragraphs 56–59 did not identify a defined process by which the evaluation could be secured.

78. The missing evaluation remained unresolved and was referenced in subsequent communications concerning Plaintiff's clinical documentation and grading.

79. In an email dated February 3, 2026, Plaintiff wrote to Karen Simmons requesting clarification regarding documentation requirements and the grading impact of incomplete or missing clinical documentation.

80. In an email dated February 11, 2026, David Harris informed Plaintiff that flexibility was provided with respect to documentation requirements during the initial weeks of clinical training.

12

81. In an email dated February 12, 2026, Karen Simmons informed Plaintiff that the points associated with missing clinical documentation were recoverable and directed Plaintiff to meet with Christy McLean if assistance was needed to address the deficiency.

82. In an email dated March 12, 2026, Krista Harrington informed Plaintiff that the missing daily evaluation could not be recreated.

83. At the time of Plaintiff's first clinical day, the cited written materials, including those described in paragraphs 69–72, did not identify a process for confirming whether required preceptor documentation had been completed or for determining that an evaluation was missing.

## D. Conflicting Institutional Guidance Regarding Preceptor Authority

84. The syllabus provides that "[b]efore performing a procedure for the first time in an assigned clinical agency … the student must also review the clinical agency's official policy and procedure to ensure compliance."

85. The syllabus further provides that students are responsible for knowing and following the clinical agency's policy regarding performance of procedures and must verify the clinical agency's policy with the clinical instructor prior to performing the procedure.

86. In an email dated February 5, 2026, Karen Simmons informed Plaintiff that compliance with preceptor direction was not subject to negotiation, stating that "this is not a negotiation whether the preceptor's directions were reasonable."

87. In an email dated February 10, 2026, David Harris informed Plaintiff that students are not expected to blindly follow a preceptor's instruction if they believe it conflicts with policy or safety.

88. In an email dated February 13, 2026, Karen Simmons instructed Plaintiff that "you should always follow the direction of your preceptor."

89. In an email dated February 24, 2026, Plaintiff wrote to Christy McLean, copying Karen Simmons, stating that he had requested to review policies prior to performing procedures and was told by his preceptor, "we don't have time for that."

90. Plaintiff requested to review clinical site policies prior to performing procedures, consistent with the syllabus requirements described in paragraphs 66–67.

91. In an email dated March 12, 2026, Krista Harrington informed Plaintiff that while the syllabus outlines course requirements, preceptors may implement additional expectations based on site policy and patient safety, and that students are expected to follow those expectations.

**E. MUSC Orangeburg Clinical Placement**

92. Plaintiff was assigned to MUSC Orangeburg for clinical learning January 27, January 29, February 3, and February 5, 2026.

93. On February 4, 2026, Plaintiff was instructed by Karen Simmons not to attend clinical learning scheduled for February 5, 2026, at MUSC Orangeburg.

94. At the conclusion of the meeting on February 4, 2026, Karen Simmons informed Plaintiff that he could make up the missed clinical day at the end of the semester.

95. In an email dated February 5, 2026, Karen Simmons outlined a list of expected behaviors for Plaintiff during clinical learning.

14

96. In an email dated February 8, 2026, Plaintiff sought clarification regarding the list of expectations provided by Karen Simmons, to include requesting identification of specific conduct deficiencies.

97. In the February 5, 2026 written communication and the February 8, 2026 exchange that followed, the communications did not identify specific behaviors or actions underlying the stated expectations or any reduced evaluation.

98. In communications to Plaintiff regarding the request that he not return for clinical learning at MUSC Orangeburg, including the February 4, 2026 meeting described in paragraphs 93–94, the communications directed that Plaintiff not attend the scheduled clinical day and addressed make-up arrangements but did not reference any disciplinary process, rule, or procedure, or identify how the resulting absence would be classified under the course grading system.

99. Course materials provide that students are not permitted to participate in patient care without appropriate supervision and are required to comply with institutional and clinical site policies governing procedures.

100. Plaintiff did not attend the scheduled clinical day at MUSC Orangeburg, and subsequent communications classified that missed day as an unexcused absence.

**F. HCA Trident Clinical Placement and Resulting Consequences**

101. Plaintiff was assigned to HCA Trident for clinical learning on February 24, February 26, March 10, and March 12, 2026.

102. On February 24, 2026, Plaintiff requested to review hospital policies.

103. Plaintiff was told, "we don't have time for that," when requesting to review hospital policies.

104. Plaintiff's communications included requests for supervision while performing clinical procedures, and on February 24, 2026, Plaintiff reported that he had requested to review policies before performing procedures.

105. In an email dated February 24, 2026, Plaintiff reported this statement to Christy McLean.

106. Plaintiff did not receive a response from Christy McLean or Karen Simmons addressing his February 24, 2026 communication reporting that he was not permitted to review clinical site policies and was told, "we don't have time for that," or providing guidance regarding how to proceed after that report, as described in paragraphs 102–105.

107. Plaintiff's February 24, 2026 communication reporting that he was not permitted to review clinical site policies, as described in paragraphs 102–105, was directed to Defendant Christy McLean in her role as Clinical Coordinator and concerned conduct later referenced in the clinical site feedback described in paragraphs 110–115.

108. Plaintiff's communication to the clinical coordinator reported that he was not permitted to review required policies.

109. On February 26, 2026, Dean Krista Harrington sent an email to Plaintiff requesting that he attend a meeting "in order to support [his] continued progress in the program," providing multiple date and time options, from which Plaintiff selected March 9, 2026.

110. In an email dated February 28, 2026, Dean Krista Harrington informed Plaintiff that the clinical site had requested that he not return for clinical learning.

111. In an email dated February 28, 2026, Dean Krista Harrington transmitted to Plaintiff feedback received from clinical site personnel regarding his recent clinical rotation at HCA Healthcare Trident hospital, including statements in the email attributed to a

"Director" stating that, after speaking with supervisors and management, the site determined that Plaintiff should not return to clinic.

112. The clinical site feedback was communicated to Plaintiff by Dean Harrington.

113. The feedback relayed by Dean Harrington from the clinical site referenced Plaintiff's requests to review policies and his conduct during clinical interactions occurring after Plaintiff had requested to review applicable policies prior to performing procedures, as described in paragraphs 102–105.

114. The feedback relayed by Dean Harrington from the clinical site described Plaintiff's conduct in connection with his clinical interactions, including his requests to review policies and conduct occurring in the context of those requests, as reflected in paragraphs 102–105, together with additional clinical and interpersonal observations that are described in the same communications and not identified as independent bases for the determination that Plaintiff should not return.

115. The clinical site feedback relayed to Plaintiff described the circumstances of Plaintiff's clinical interactions and stated that he should not return to the clinical site.

116. The feedback relayed in the February 28, 2026 communication was attributed to a "Director" and stated that the determination that Plaintiff should not return was made after consultation with supervisors and management.

117. The February 28, 2026 communication from Dean Krista Harrington relaying clinical site feedback, as described in paragraphs 110–116, does not identify conduct distinct from the matters referenced in paragraphs 102–105 as the basis for the determination that Plaintiff should not return.

118. Program officials, including Dean Harrington, informed Plaintiff that he would not return to the clinical site based on the February 28, 2026 communication relaying clinical site feedback.

119. In the communications described in paragraphs 110–116, the communications did not identify a specific program policy violation or reference a defined academic standard governing the determination.

120. Course materials provide that program faculty may assign an "unacceptable" evaluation based on additional feedback from preceptors or other supervising clinical personnel even where such evaluation was not originally indicated in the clinical documentation.

121. The February 28, 2026 communication from Dean Krista Harrington relaying clinical site feedback, as described in paragraphs 110–115, and the subsequent communications enforcing Plaintiff's removal from clinical placement and resulting grading consequences, did not identify a specific evaluation criterion, behavior-based standard, or grading rule governing how that feedback resulted in academic consequences or how missed clinical days resulting from that determination were classified within the grading system.

122. Following the clinical site communications described in paragraphs 110–115, Plaintiff was unable to return to the clinical site and missed scheduled clinical days, and those missed clinical days were later classified as unexcused absences with corresponding grading consequences.

123. In the communications provided to Plaintiff, Defendants did not explain how the conduct described in the clinical site feedback was evaluated under any identified academic criteria or how it resulted in the academic consequences imposed, nor did the

18

communications identify how Plaintiff's inability to attend scheduled clinical days after the clinical site determination that he should not return was incorporated into the academic grading system.

124. Course materials provide that removal from the clinical area based on performance concerns may result in failure of the clinical component of the course and inability to progress in the program.

125. In the communications provided to Plaintiff, no specific program policy violation was identified in connection with the determination that he should not return to the clinical site.

126. In the communications produced, Plaintiff was not provided written guidance identifying specific actions required to address the conduct described in the clinical site feedback or to satisfy the expectations referenced in those communications.

127. Plaintiff was not permitted to return to the clinical site and, as reflected in paragraphs 110–115 and 122, missed scheduled clinical days, which were classified as unexcused absences resulting in grading consequences, without reassignment to an alternative clinical placement for those missed days.

128. In an email dated March 4, 2026, Dean Krista Harrington informed Plaintiff that "[t]he meeting is informational and not disciplinary" and that he was "not facing disciplinary action."

129. The March 4, 2026 communication from Dean Krista Harrington stating that the matter was "informational and not disciplinary," as described in paragraph 128, occurred while Plaintiff was subject to loss of clinical placement, classification of missed clinical days

19

as unexcused absences, and resulting grading consequences, as reflected in paragraphs 122–127 and 130–138.

130. Following clinical site requests that Plaintiff not return, Plaintiff missed scheduled clinical learning days.

131. Defendants treated the missed clinical days as unexcused absences following the clinical site's request that Plaintiff not return.

132. Unexcused absences resulted in point deductions applied to Plaintiff's course grade.

133. At least one such absence resulted in a 15-point deduction.

134. The course grading system assigned point values to attendance and documentation, including a 15-point deduction for an unexcused absence and a maximum deduction of 30 points in that category.

135. Course materials provide that failure to complete required clinical documentation by the end of the clinical day results in a grade of zero for that day, classification as an unexcused absence, and a corresponding point deduction in the course grading system.

136. In an email dated March 4, 2026, Dean Krista Harrington informed Plaintiff that "[t]here is no good academic reason for you to attend classes on Monday."

137. During the March 9, 2026 meeting, Dean Krista Harrington requested that Plaintiff identify the objective criteria by which he should be evaluated.

138. During the March 9, 2026 meeting, Defendant Harrington asked Plaintiff to identify the objective criteria by which he believed he should be evaluated.

139. Simmons further stated that missed clinical days would result in point deductions consistent with the grading system described above, including a 15-point deduction for an unexcused absence and a maximum deduction of 30 points in that category.

20

140. Simmons stated that these calculations would result in a final grade of 70%.

141. Simmons further stated that, even if Plaintiff were to pass the course, it was unlikely that he would pass future clinical courses due to continued unexcused absences resulting from being unable to return to a clinical site.

142. Simmons stated that Plaintiff could request a future meeting to discuss readmission to the program.

## G. Institutional Response to Clinical Removal

143. Plaintiff remained subject to grading consequences arising from missed clinical days described in paragraphs 122 and 130–138, including classification of those days as unexcused absences, which he was unable to attend due to clinical site restrictions.

144. Course materials describing the grading system, including the provisions referenced in paragraphs 134–135, do not identify in the cited written materials how absences resulting from clinical site restrictions are classified within the grading system.

145. Absences resulting from clinical site requests that Plaintiff not return for clinical learning were treated as unexcused under the grading system, including those described in paragraphs 122 and 130–138.

## H. Classification of Absences

146. The classification of absences as unexcused affected Plaintiff's clinical attendance record and contributed to grading consequences applied within the course.

147. Course materials and communications, including the syllabus and clinical documentation instructions, do not identify in the cited written materials how absences

resulting from clinical site requests that a student not return are evaluated or applied within the grading system.

148. In an email dated April 1, 2026, Christy McLean informed Plaintiff that his clinical rotation scheduled for the following day was changed from the Roper Berkeley location to the St. Francis location for that day only due to construction and inspections at the original site.

149. This reassignment was completed on short notice through faculty communication and action.

150. On April 14, 2026, Plaintiff attended a clinical learning assignment at East Cooper Medical Center.

151. On April 15, 2026, Plaintiff participated in a meeting during which he was informed that the clinical site had requested that he not return to complete the rotation.

152. In an email dated April 15, 2026, Defendant Harrington confirmed that East Cooper requested that Plaintiff not return for the following scheduled clinical day.

153. Plaintiff was informed that the resulting inability to attend the scheduled clinical day would be classified as an unexcused absence.

154. Plaintiff was informed that this absence would result in a 15-point deduction under the course grading system.

155. Plaintiff was further informed that this absence would constitute a second unexcused absence, resulting in a total deduction of 30 points.

156. Plaintiff was informed that the resulting grading impact would render him not successful in RES 150.

157. The communication included statements attributed to clinical site personnel characterizing Plaintiff's conduct as "argumentative and aggressive," without identifying any academic standard, evaluation rubric, or defined behavioral criterion governing that determination.

158. Plaintiff was not provided, in the cited communications, an identified opportunity to respond to those allegations before grading consequences were imposed, and the resulting consequences were not tied to any identified academic evaluation standard.

## I. Grievances

159. The South Carolina Technical College System provides a formal student grievance procedure governing the resolution of student complaints.

160. The grievance procedure provides that a student must submit a written grievance within fifteen instructional days of the occurrence giving rise to the complaint.

161. The grievance procedure provides that, upon receipt of a grievance, the institution will acknowledge the grievance within two instructional days.

162. The grievance procedure further provides that a preliminary review and response will be issued within ten instructional days following receipt of the grievance.

163. The grievance procedure provides that a student may request further review, including review by a grievance committee, if the student is dissatisfied with the initial response.

164. The grievance procedure provides that a written decision will be issued following review of the grievance, in accordance with the timelines and procedures established by the institution.

23

165. On March 16, 2026, Plaintiff filed three grievances addressing the following issues: failure to provide adequate guidance and defined evaluation criteria; failure to assign Plaintiff to alternative clinical sites following site requests that he not return; and classification of site-request absences as unexcused.

166. Two grievances were accepted on the same day of filing.

167. One grievance was designated as proprietary and was not accessible for printing.

168. Plaintiff did not receive any response to the grievances described in paragraphs 165–167 within the timeframes set forth in paragraphs 159–164, and no determination or review was provided.

## J. Demonstrated Ability to Reassign Clinical Placements

169. In an email dated April 1, 2026, timestamped 4:43 p.m., Plaintiff was notified that his clinical learning site location was changed from Roper Berkeley to Roper St. Francis.

## K. Ongoing Impact and Prospective Harm

170. Absences resulting from clinical site requests that Plaintiff not return for clinical learning continued to be classified as unexcused under the grading system.

171. Some absences resulting from clinical site restrictions were permitted to be made up, while at least one such absence was not.

172. The absence that was not permitted to be made up resulted in a 15-point deduction under the course grading system.

173. In an email dated March 13, 2026, Karen Simmons informed Plaintiff that it was unlikely he would pass the course (RES150) from an academic standpoint.

174. Plaintiff was further informed in the March 13, 2026 email that, in the event Plaintiff were to pass the course, it is unlikely that Plaintiff would pass future clinical courses due to the recurrence of clinical scheduling conditions resulting in unexcused absences tied to clinical site requests that Plaintiff not return for clinical learning.

175. Plaintiff was informed by Karen Simmons that future clinical scheduling would continue in a manner that would result in additional unexcused absences and corresponding grading penalties where site restrictions prevented attendance.

176. These prospective scheduling practices, as described in the communications produced, would result in continued classification of absences as unexcused and additional grading penalties, further impairing Plaintiff's ability to pass future clinical courses and progress in the program.

177. The grading impact associated with these classifications reduced Plaintiff's course grade and affected his ability to progress to the next semester as scheduled.

178. Plaintiff's missed clinical time and resulting grading penalties affect a required progression course and, if not corrected, would delay his advancement in the program.

179. Plaintiff requested to review clinical site policies and procedures as required by the syllabus and communicated with program officials to report that he was not permitted to review required policies and to request guidance; Plaintiff's broader written communications also included requests for supervision while performing procedures.

180. Plaintiff's communications included references to the syllabus, requests for access to governing policies, requests for supervision in connection with performing procedures, and reports that he was not permitted to review required policies.

25

181. These communications were directed to program officials responsible for Plaintiff's academic evaluation and clinical placement, including Christy McLean.

182. Plaintiff's communications included repeated written requests that Defendants identify the objective criteria used to evaluate clinical performance and grading, including requests that Defendants explain how grading penalties were calculated and how evaluation domains were applied, and included statements that the absence of specific, objective, observable behaviors and criteria prevented formulation of corrective actions and SMART goals aligned with the evaluation standards.

183. Plaintiff's communications further included statements that the feedback provided by clinical personnel lacked specific, objective, observable behaviors that could be measured or acted upon, and that without such information Plaintiff was unable to align his conduct with the expectations required to achieve satisfactory evaluation.

184. Plaintiff's requests to review clinical policies and to receive supervision while performing procedures were consistent with course requirements that students review applicable policies and perform procedures under appropriate supervision in the patient-care setting.

185. The actions taken against Plaintiff, including clinical site requests that he not return, resulting missed clinical days, and application of grading penalties, occurred after the communications described in paragraphs 179–184 and prior to and including the clinical site exclusion and grading consequences described in paragraphs 130–158.

## L. Evaluations and Documentation

186. Clinical evaluations during RES 150 were conducted using standardized Trajecsys forms consisting of broad domains, with each domain rated using tiered categories such as "Acceptable," "Needs Improvement," and "Unacceptable."

187. The evaluation materials do not identify objective, observable behaviors, scoring anchors, or defined thresholds governing the assignment of ratings within these domains.

188. Evaluations completed by different clinical preceptors reflect differing characterizations of Plaintiff's performance, with accompanying comments that do not reference defined performance standards or procedural criteria.

189. The Spring 2026 academic term for RES 150 concludes on April 24, 2026, and the grading consequences described above resulted in a projected failing outcome for Plaintiff in the course.

190. Plaintiff's progression in the Respiratory Care Program requires successful completion of RES 150 with a grade of C or better, as described in paragraph 22, and failure to achieve that grade results in inability to advance to subsequent clinical courses and continuation in the program.

191. Plaintiff remained enrolled in the Respiratory Care Program during the Spring 2026 academic term and was participating in RES 150 as a required course for progression, such that the grading consequences described in paragraphs 122–158 directly affected his ability to continue in the program.

192. Plaintiff faces imminent and irreparable harm because the academic term for RES 150 concludes on April 24, 2026, and the grading consequences described in paragraphs 122–158 will result in a final course determination affecting Plaintiff's progression

27

before any judicial review can occur, and such loss of clinical participation, academic credit, and program progression cannot be fully remedied through monetary damages or post hoc review.

193. Plaintiff's progression in the Respiratory Care Program requires successful completion of RES 150 with a grade of C or better, as described in paragraph 22, and failure to achieve that grade results in inability to advance to subsequent clinical courses and continuation in the program.

## V.  LEGAL CLAIMS

### A.  First Cause of Action: First Amendment (42 U.S.C. § 1983)

194. Plaintiff incorporates paragraphs 1–193.

195. Between January 22, 2026 and February 25, 2026, Plaintiff repeatedly communicated with program officials to request review of clinical site policies before performing procedures, requests for supervision while performing procedures, report that he had been denied access to policy review, and request identification of the evaluation criteria and conduct being applied to him, as reflected in paragraphs 34–59, 84–91, 102–109, and 179–184.

196. The adverse actions described in paragraphs 109–158, including removal from clinical placement and the imposition of grading consequences, were communicated to Plaintiff by Defendants Harrington and Simmons after Plaintiff's communications described in paragraphs 179–184 and after the February 28, 2026 relay of clinical site feedback described in paragraphs 110–116, with Defendant McLean participating in the chain of clinical oversight and communication described in paragraphs 102–105 and 181.

28

197. Defendants expressly characterized the actions described above as "informational and not disciplinary," as reflected in paragraph 128.

198. The actions taken against Plaintiff were not imposed through disciplinary procedures, and the communications provided to Plaintiff, including those described in paragraphs 110–116 and 122–158, did not identify an academic evaluation process, did not identify a governing standard, and did not describe a methodology by which the cited conduct was assessed in determining the resulting academic consequences.

199. Plaintiff's communications occurred between January 22, 2026 and February 25, 2026, and on February 24, 2026 Plaintiff reported that he had requested to review required clinical site policies and had been told there was no time to do so, as described in paragraphs 102–105 and 179–184.

200. On February 28, 2026, Defendant Harrington relayed clinical site feedback stating that Plaintiff should not return to the clinical site, as described in paragraphs **110–116**.

201. Following that communication, the clinical site requested that Plaintiff not return for clinical learning, and Plaintiff thereafter was unable to return to the clinical site and incurred grading consequences as described in paragraphs 122–158.

202. Plaintiff's communications included requests to review clinical site policies prior to performing procedures and requests for supervision in connection with patient-care activities, as described in paragraphs 84–91, 102–109, and 179–184.

203. The communications described in paragraphs 34–59, 84–91, 102–109, and 179–184 concerned whether Plaintiff could review applicable clinical policies before performing procedures, whether he would receive supervision while participating in patient-care

29

activities, and what specific standards program officials were applying when evaluating his conduct and assigning grading consequences.

204. These communications concerned whether required supervision and policy review had occurred before Plaintiff participated in clinical procedures and addressed the conditions under which students were permitted to engage in patient care activities.

205. The issues raised in these communications concerned compliance with established safety protocols applicable to all students and clinical personnel.

206. The clinical site feedback relayed to Plaintiff by Defendant Harrington, as described in paragraphs 110–116, identified Plaintiff's requests to review clinical site policies and references to program requirements, including repeated references to the syllabus and requests to review policies, as part of the conduct cited by clinical site personnel in determining that Plaintiff should not return to the clinical site.

207. The feedback attributed to clinical site personnel characterized Plaintiff's requests to review policies and adherence to program requirements as conduct that made staff uncomfortable and interfered with clinical workflow, and included those statements among the reasons supporting the determination that Plaintiff should not return to the clinical site.

208. The communication relayed by Defendant Harrington attributed the determination that Plaintiff should not return to statements from a "Director" or site personnel, and identified the conduct described above, including Plaintiff's requests to review policies and statements regarding patient safety, as among the reasons for that determination.

209. The clinical site feedback described in paragraphs 110–116 identified Plaintiff's requests to review policies, requests for supervision, and references to program

requirements as part of the conduct underlying the determination that Plaintiff should not return to the clinical site.

210. The clinical site feedback described in paragraphs 110–116 identified Plaintiff's requests to review policies, requests for supervision, and references to program requirements, and the conduct identified in that feedback corresponded to the communications described in paragraphs 84–91, 102–109, and 179–184.

211. The conduct identified in the clinical site feedback described in paragraphs 110–116 and relied upon by Defendants in imposing the adverse actions described in paragraphs 110–158 included Plaintiff's requests to review policies, requests for supervision, and references to program requirements, as described in paragraphs 84–91, 102–109, and 179–184.

212. After Plaintiff reported on February 24, 2026 that he had requested to review clinical site policies prior to performing procedures and had been told "we don't have time for that," as described in paragraphs 102–105 and 179–184, Defendant Harrington, on February 28, 2026, relayed clinical site feedback stating that Plaintiff should not return to the clinical site, and that feedback referenced Plaintiff's requests to review policies, requests for supervision, and references to program requirements, after which Defendants enforced the resulting inability to return to the clinical site through the communications described in paragraphs 110–158, resulting in Plaintiff's inability to return to the clinical site and missed clinical days.

213. The adverse actions described above were implemented after the conduct identified in the clinical site feedback, including Plaintiff's requests to review policies, requests for

31

supervision, and references to program requirements, and followed the February 28, 2026 communication described in paragraphs 110–116.

214. After Plaintiff's February 24, 2026 communication described in paragraphs 102–105 and 179–184, Defendant Harrington relayed the February 28, 2026 clinical site feedback described in paragraphs 110–116, and Defendants Harrington and Simmons then enforced the resulting inability to return to the clinical site through the missed clinical days and grading consequences described in paragraphs 122–158.

215. Defendants did not reassign Plaintiff to an alternative clinical placement during the period in which he was unable to return to the clinical site, as described in paragraphs 110–116 and 122–158, resulting in continued missed clinical days classified as unexcused absences and corresponding grading consequences.

216. At the time Defendants enforced the consequences described in paragraphs 122–158, Plaintiff had previously been reassigned between clinical sites during the course, and Defendants did not reassign Plaintiff to an alternative clinical placement for the clinical days affected by the site's request that he not return.

217. Plaintiff's communications were not limited to a single exchange. As described in paragraphs 34–59, 84–91, 102–109, and 179–184, Plaintiff repeatedly made written requests for clarification of evaluation criteria, grading methodology, policy review, and supervision before the adverse actions described in paragraphs 110–158.

218. The adverse actions described in paragraphs 110–158, including the inability to return to the clinical site, classification of missed clinical days as unexcused, and resulting grading penalties, occurred after the communications described in paragraphs 34–59,

32

84–91, 102–109, and 179–184, and followed the February 28, 2026 communication relaying clinical site feedback referencing those communications.

219. The adverse actions described in paragraphs 109–158 were implemented by Defendants Harrington and Simmons after the communications described in paragraphs 34–59, 84–91, 102–109, and 179–184 and followed the February 28, 2026 communication relaying clinical site feedback referencing those communications.

220. The adverse actions described in paragraphs 110–158 followed the February 28, 2026 communication relaying clinical site feedback described in paragraphs 110–116, which referenced the same conduct identified in paragraphs 84–91, 102–109, and 179–184.

221. Defendants Harrington and Simmons had knowledge of Plaintiff's prior communications requesting policy review, supervision, and clarification of evaluation criteria, as described in paragraphs 34–59, 84–91, 102–109, and 179–184, and after the February 28, 2026 communication relaying clinical site feedback described in paragraphs 110–116, Defendants enforced the resulting missed clinical days, classification of those days as unexcused absences, and corresponding grading consequences described in paragraphs 122–158.

222. Plaintiff reported on February 24, 2026 that he had requested to review policies and was told "we don't have time for that," that Defendant Harrington thereafter relayed clinical site feedback referencing Plaintiff's requests to review policies, requests for supervision, and references to program requirements, and that Defendants then enforced the resulting inability to return to the clinical site through classification of missed clinical days and corresponding grading consequences.

223. Defendants Harrington and Simmons, having knowledge of Plaintiff's communications described in paragraphs 179–184, enforced the clinical site determination described in paragraphs 110–116 and applied the resulting grading consequences described in paragraphs 122–158 after the February 28, 2026 communication relaying clinical site feedback referencing those communications.

224. The clinical site feedback underlying those actions, as described in paragraphs 110–116, referenced Plaintiff's conduct, including requests to review policies and requests for supervision, and the communications provided to Plaintiff did not identify a defined academic standard, evaluation rubric, or specific performance-based criterion governing that determination.

225. Defendants Harrington, Simmons, and McLean acted in their official capacities as administrators and instructors of a public educational institution, as described in paragraphs 8–12.

226. As described in paragraphs 102–109, 122–128, and 153–158, the communications imposing or explaining the challenged actions did not identify a separate policy violation, did not explain how the cited conduct failed any stated academic criterion, and did not describe any standard governing when site feedback would result in removal from placement and grading penalties.

227. The actions described in paragraphs 110–158 included removal from clinical placement, classification of missed clinical days as unexcused, and resulting grading penalties following Plaintiff's requests for policy clarification, supervision, and identification of evaluation criteria, as described in paragraphs 34–59, 84–91, 102–109, and 179–184.

**B. Second Cause of Action: Procedural Due Process (42 U.S.C. § 1983)**

228. Plaintiff incorporates paragraphs 1–193.

229. Institutional policy provides that instructors will develop, distribute, explain, and follow the standards used in evaluating student performance and determining grades, and that grades are awarded based on academic performance and will not be reduced as a disciplinary action for student conduct unrelated to academic performance.

230. The course syllabus provides that successful completion of RES 150 with a grade of C or better is required for progression in the Respiratory Care Program, such that grading determinations in RES 150 directly determine whether a student may continue in the program.

231. Plaintiff's interest in progression in the program was therefore contingent on the application of defined academic standards governing evaluation and grading, as reflected in the policies and syllabus described above, and where progression depends on successful completion of RES 150 with a grade of C or better and failure to achieve that grade results in inability to advance to subsequent clinical courses and continuation in the program.

232. Defendants imposed grading consequences within a required progression course, RES 150, affecting whether Plaintiff could continue in the Respiratory Care Program, including grading consequences that resulted in a determination that Plaintiff would not be successful in the course and would be unable to advance to subsequent clinical courses and continue in the program, while institutional policies represented that student performance would be evaluated under defined academic standards and that grades would not be reduced as a disciplinary action for student conduct unrelated to academic performance.

35

233. Alternatively, Plaintiff alleges that the challenged actions were based on communications from clinical site personnel characterizing his behavior, resulted in removal from clinical placement and grading penalties, and, in the communications provided to Plaintiff as described in paragraphs 110–116 and 122–158, were not accompanied by written notice identifying a specific rule violation or any stated process for contesting the underlying accusations before those penalties were applied.

234. Plaintiff alleges that Defendants told him the matter was "informational and not disciplinary," but also imposed consequences affecting his placement and grade, and that despite his repeated written requests for identification of the specific criteria and conduct at issue, the communications to him did not identify a specific policy violation, did not identify the standard being applied, and did not state what procedure was available to challenge the basis of the consequences before they were implemented.

235. The adverse actions, including unexcused-absence designations and grade deductions, affected Plaintiff's academic credit and progression in the program, and the communications provided to Plaintiff did not identify a governing standard, did not provide notice of specific conduct at issue, and did not state an opportunity to respond before those actions were implemented.

236. Plaintiff alleges an interest in remaining enrolled and progressing in the Respiratory Care Program, where progression depends on successful completion of RES 150 with a grade of C or better, as described in paragraphs 227–228, and where the grading consequences described in paragraphs 122–158, including classification of absences as unexcused and resulting point deductions, resulted in a determination that Plaintiff would not be successful in the course and a projected failing outcome, as described in

36

paragraphs 156 and 189, thereby preventing advancement to subsequent clinical courses and continuation in the program.

237. The actions described in paragraphs 110–158 were not accompanied by identification of any academic standard, evaluation rubric, or performance-based criterion governing those determinations.

238. Institutional policy provides that student performance will be evaluated pursuant to defined standards and that grades will be assigned based on academic performance under those standards, as described in paragraphs 41–42.

239. Plaintiff was deprived of that interest through grading consequences, including classification of absences as unexcused and resulting point deductions affecting his course grade, including those described in paragraphs 122–158.

240. Because Defendants told Plaintiff he was "not facing disciplinary action," Plaintiff alleges that the resulting removal from placement, unexcused-absence classifications, and point deductions were imposed as academic determinations, and the communications to him did not identify the academic standard, evaluation rubric, or grading rule by which the cited conduct was evaluated.

241. Plaintiff requested identification of the criteria applied in evaluating his performance, identification of the conduct forming the basis for adverse academic determinations, and an opportunity to respond to or correct alleged deficiencies prior to the imposition of grading consequences.

242. Plaintiff was not provided identification of the specific evaluation criteria or grading standards as applied to his performance, was not informed of the specific conduct constituting a deficiency under any identified standard, and, after filing the grievances

described in paragraphs 165–167, did not receive any response or review within the timeframes set forth in paragraphs 159–164 before or during the imposition of the adverse actions described in paragraphs 122–158.

243. Plaintiff was not provided information sufficient to determine how to correct alleged deficiencies before adverse actions were taken, including identification of the conduct at issue or the standard applied.

244. Plaintiff alleges that Defendants neither identified a disciplinary process applicable to the challenged actions nor identified an academic evaluation standard governing those actions, and the communications to Plaintiff did not state whether the actions were taken under disciplinary rules or academic criteria.

245. Plaintiff submitted multiple written requests seeking identification of the specific evaluation criteria, grading methodology, and conduct forming the basis for adverse evaluations, including detailed questions regarding Trajecsys documentation, grading deductions, and evaluation domains, and those requests, along with the grievances described in paragraphs 165–167, were not answered with specific or actionable information within the timeframes described in paragraphs 159–164.

246. Plaintiff further informed Defendants that the feedback he received did not identify specific, objective behaviors and therefore prevented him from formulating corrective actions or SMART goals aligned with the evaluation criteria, and no additional clarification was provided in response.

247. The grievance process described in paragraphs 159–164 did not result in any response or review within the required timeframes and therefore did not provide Plaintiff with an

opportunity to prevent or correct the imposition of grading consequences before those consequences affected his course standing and progression.

248. Plaintiff was not provided notice identifying the specific conduct at issue, the standard applied, or an opportunity to respond before the imposition of grading consequences described in paragraphs 122–158.

249. The information described above was not provided prior to removal from clinical placement and the imposition of grading consequences, and was not provided at any time thereafter in a form that permitted Plaintiff to understand or correct the conduct at issue.

250. In the communications described in paragraphs 34–59, 84–91, 102–109, and 179–184, Plaintiff did not receive explanation of how evaluation criteria were applied to his performance.

251. Plaintiff alleges that the communications he received did not identify what specific conduct failed what specific standard and did not explain how the cited conduct translated into placement removal and point deductions, and therefore did not identify what conduct was required to avoid those consequences.

252. Plaintiff was subjected to classification of missed clinical days as unexcused absences after clinical sites requested that he not return for clinical learning, as described in paragraphs 110–158, and the communications to Plaintiff did not explain what rule required those site-request absences to be treated as unexcused rather than addressed through reassignment or another classification.

253. Plaintiff alleges that neither the communications to him nor the course materials identified when absences caused by a site's refusal to permit further attendance would

39

be classified as unexcused, how those absences would be treated in the grading system, or what process existed for Plaintiff to challenge that classification before the resulting point deductions were imposed.

254. Although course materials describe grading consequences for unexcused absences and incomplete documentation, Plaintiff alleges that they do not identify how a clinical site determination that a student should not return is to be translated into removal from placement, denial of reassignment, classification of missed days as unexcused absences, and resulting grading penalties.

## C. Third Cause of Action: Substantive Due Process (42 U.S.C. § 1983)

255. Plaintiff incorporates paragraphs 1–193.

256. Defendants removed Plaintiff from clinical placement, did not reassign him after the HCA exclusion, and imposed or threatened grading consequences including unexcused-absence classifications and corresponding point deductions, as described in paragraphs 110–158, resulting in a determination that Plaintiff would not be successful in RES 150 and unable to advance to subsequent clinical courses and continue in the program, based on site feedback that was relayed to Plaintiff through Dean Harrington and that referenced Plaintiff's requests to review policies, requests for supervision, and references to program requirements.

257. Plaintiff alleges that Defendants relied on determinations made by clinical site personnel when removing him from clinical placement and treating resulting missed days as unexcused absences, without independently applying defined academic standards or exercising professional academic judgment in translating those determinations into academic consequences.

258. Plaintiff alleges that, in the communications provided to him, Defendants did not identify a written academic standard, evaluation rubric, or stated methodology explaining how site feedback concerning his conduct was assessed and then translated into removal from placement, denial of reassignment, and grading penalties.

259. Defendants enforced clinical site determinations and translated those determinations into academic consequences, and the communications provided to Plaintiff did not identify any academic criterion, evaluation rubric, or professional assessment governing that decision.

260. As a result, Plaintiff was subjected to removal from clinical placement and grading penalties based on conduct that was not evaluated under any defined academic standard, and the communications provided to Plaintiff did not describe how that conduct was assessed, corrected, or avoided.

261. Plaintiff informed Defendants in writing that the evaluation ratings assigned to him appeared arbitrary and untethered from objective criteria, including where the behaviors identified as acceptable in SMART goals were the same behaviors Plaintiff had been engaging in at the time the reduced ratings were issued.

262. Plaintiff further informed Defendants that the absence of specific, measurable behavioral criteria prevented alignment between evaluation domains and observed conduct, resulting in ratings that could not be reconciled with the feedback provided.

263. These conditions resulted in evaluation determinations that were not tied in the communications to defined academic standards, observable conduct, or any articulated academic methodology, and the communications did not describe a process of professional academic evaluation.

264. The communications provided to Plaintiff did not identify what specific academic standard his conduct failed to satisfy, what specific conduct formed the basis of the academic consequences imposed, or how the cited site feedback was converted into the grading and progression consequences described in paragraphs 122–158.

265. The communications provided to Plaintiff did not identify how his conduct failed to satisfy any academic standard or how clinical site feedback was translated into academic consequences.

## VI. PRAYER FOR RELIEF

266. WHEREFORE, Plaintiff requests:

267. Declaratory relief as set forth below;

268. A declaration that Defendants' actions, including reliance on clinical site determinations without identification of governing academic standards and the imposition of grading consequences without identified evaluation criteria, violated Plaintiff's rights under the First and Fourteenth Amendments;

269. Injunctive relief prohibiting Defendants from classifying as unexcused absences the clinical days Plaintiff was unable to attend due to clinical site restrictions, and from applying grading penalties or point deductions arising from those classifications, pending further order of the Court;

270. Injunctive relief prohibiting Defendants from assigning a failing grade, withdrawal, or other adverse academic consequence in RES 150 based on absence classifications or grading determinations arising from the clinical site exclusion described in this Complaint, pending further order of the Court;

42

271. Injunctive relief requiring Defendants, prior to the imposition of further grading consequences, to identify the academic standards and evaluation criteria applied to Plaintiff's performance and to provide Plaintiff an opportunity to respond consistent with due process protections;

272. Injunctive relief prohibiting Defendants from enforcing grading consequences that are not tied to identified academic standards or evaluation criteria reflected in the course materials and institutional policies described in this Complaint;

273. Costs of this action and any other relief to which Plaintiff may be entitled under 42 U.S.C. § 1988 or other applicable law;

274. Any further relief deemed appropriate.

## VII. JURY DEMAND

275. Plaintiff demands a jury trial on all issues so triable.

**Respectfully submitted,**

Vito Carmalitano Jr.
5516 Clearview Dr
North Charleston, SC 29420
845-475-4068
Vito.Carmalitano@gmail.com
Pro Se Plaintiff

Date: 4/20/2026

VERIFICATION

I, Vito Carmalitano Jr., declare under penalty of perjury that the foregoing Verified Complaint is

43

true and correct to the best of my knowledge and belief.

Executed on _____.

Vito Carmalitano Jr